# 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉

SOUTHERN RAILWAY COMPANY v. LUTHER M. CALLIS.

December 3, 1951.

Record No. 3813.

Present, Hudgins, C. J., and Eggleston, Buchanan, Miller and Whittle, JJ.

*Thomas B. Gay, Lewis F. Powell, Jr.* and *H. Merrill Pasco,* for the plaintiff in error.

*Thomas A. Williams, R. Nelson Smith* and *Thos. A. Williams, Jr.,* for the defendant in error.

HUDGINS, C. J., delivered the opinion of the court.

Luther M. Callis instituted this action to recover damages for personal injuries alleged to have resulted from the negligence of the Southern Railway Company. The jury returned a verdict for $26,200, on which the trial court entered judgment for plaintiff.

At approximately 9:40 p. m. on February 12, 1948, plaintiff was run over by one or more freight cars pushed by defendant's Diesel yard engine westwardly from its privately owned right of way into and along Dock street in Richmond, Virginia. He lost both legs, one amputated above and the other below the knee, and sustained other serious and permanent injuries.

The main contention is that the trial court committed reversible error in its refusal to set aside the verdict. A motion to strike the evidence, and later a motion to set aside the verdict, were based on the contention that plaintiff's evidence did not prove defendant guilty of negligence, and that, even if it did prove such negligence, plaintiff's own testimony convicted him of contributory negligence.

The scene of the accident was in that part of the industrial and manufacturing area of the city lying east of 15th and south of Cary streets. A rough sketch, not drawn to scale, is filed herewith. Dock street extends west from 28th street to 17th street which it does not cross. A half block south of this intersection Dock street (hereinafter referred to as "lower Dock

street") continues from 17th street in a westerly direction under the Seaboard Air Line trestle to 14th street.

Defendant's railroad track extends from 28th street west on Dock street, crossing 17th street at right angles into Talbott's alley. This track then extends along Talbott's alley approximately 88 feet from 17th street, then turns southwest, and as it leaves the alley, it forms an S curve southwestwardly across defendant's own land and across another spur track into a switch on lower Dock street, where it merges with a third track extending west from 17th street along the north side of lower Dock street to 14th street. The spur track, which the track extending from Talbott's alley crosses on defendant's own right of way, extends from lower Dock street in a northerly direction to a dead end in Cosby's junk yard. (See sketch at end of case)

Lower Dock street is 50 feet wide and paved with cobblestones. There is no walk-way on either side. The south rail of defendant's track on lower Dock street is approximately 35 feet from the south curb. The pavement between and to the north of the rails is rough and uneven and, while open to the public, is not generally used at night by either pedestrians or vehicles, certainly not as much as that part of the street which lies between the south rail and south curb.

Defendant has no turning facilities on the three tracks which serve the industrial houses along Dock street, and hence considerable shifting of cars, including pushing them ahead of the engine, is necessary. It was during such shifting of cars that plaintiff was injured.

Plaintiff was the only eyewitness to the accident. He testified that he lived in York county and was employed by the Virginia Commission of Fisheries. On the night of the accident he went to Richmond to see "Captain Herbert" Presson on business. "Captain Herbert" is engaged in selling oysters and fish, and owns a boat which was tied up at or near the southeast corner of 17th and lower Dock streets. Plaintiff left his automobile with a friend at Bottoms Bridge and went to Richmond in an automobile driven by Mrs. Prunetta Zimmerman. The other passengers in the automobile were Charles Hornsby, plaintiff's nephew, William Spears and Donald Pridgeon. Mrs. Zimmerman, with her four passengers, arrived at 17th and lower Dock streets a little before 9:00 p. m. There Hornsby and Spears got out of the automobile and, as they started to the

boat, plaintiff requested them to tell "Captain Herbert" that he would be in to see him in a few minutes. Mrs. Zimmerman drove west from 17th street and parked her automobile a few feet west of two freight cars standing in lower Dock street near the end of the railroad track. Plaintiff remained in the automobile five to ten minutes, after which he got out and Mrs. Zimmerman, with Pridgeon riding with her, drove away.

Plaintiff testified that he desired to urinate and, instead of turning east on Dock street in the direction of "Captain Herbert's" boat, he turned west and walked along Dock street for a distance of from 180 to 200 feet where he stopped in the "darkest spot," 19.3 feet east of the Seabord Air Line trestle. He stood between the rails of the track extending into Talbott's alley facing north, nearer the northern than the southern rail. Before he began to urinate, and during the two or three minutes he said he was urinating, he repeatedly looked and listened for approaching trains and traffic, and saw none. His exact words were: "Well, I just stood facing the north, standing on the cobblestones there. I looked up the street and looked down the street, nobody was coming. Then I finished up and I started to turn around like that (indicating a turn to the right) and there was the train right on top of me. * * * It was coming out there with such force it was nothing I could do. I had to grab it with that hand. (Indicating his right hand) I couldn't jump or do anything."

The Diesel switching engine, with a crew of five, left 28th street for the purpose of "picking up" freight cars from the three spur tracks described. Three box cars and three gondolas were "picked up" between 28th and 17th streets. The three gondolas were next to the engine and the three box cars were in the lead. The train stopped at 17th and Dock streets where the conductor, B. J. Whitehead, walked south on 17th street to lower Dock street to ascertain if any freight cars had been emptied or loaded, and was closing the door to one of the two freight cars, standing near the intersection of lower Dock and 17th streets when he was informed of the accident.

The engine, pushing the six cars, left 17th street in a westerly movement through Talbott's alley. Walter Whetstone, one of the brakeman, was standing on top of the lead box car about 15 feet from the forward end, with an electric light in his hand which enabled him to see 60 to 70 feet in front of the lead car.

Joseph M. Smith, another brakeman, was on the box car nearest to the engine, with a lighted electric lantern in his hand. As the engine pushed the cars, its headlight was burning, though the box cars prevented it from shining on the track in front of the lead car. The engineer and fireman were at their respective places in the cab of the engine. They testified that the automatic signal bell was ringing from the time the train left 17th street until the engineer cut it off after the accident. The cars were pushed approximately 88 feet along Talbott's alley, thence southwestwardly through the S curve across defendant's private right of way into the switch which connects the track extending east and west on lower Dock street.

As the box car on which Whetstone was standing approached the Seaboard Air Line trestle, he "crouched," or "squatted" down in order to pass safely under the trestle. In so doing, he held the electric lantern down by his side. He passed plaintiff without seeing him, got off the car at 15th street, and was signalling the engineer to continue the westward movement of the train across 15th street when Smith discovered plaintiff.

As the third box car on which Smith was riding reached the trestle, he stepped off on the ground and observed a shoe and hat lying on the north side of the track opposite the point of the switch, and saw approximately 40 feet west a "bundle of something" which, at the moment he thought was paper being dragged under the car ahead. He said to the engineer "Wait a minute," and at the same time gave a stop signal, in response to which the engineer stopped the train within five or six feet. Smith and other members of the crew found plaintiff lying across the north rail with both legs crushed. The crew immediately telephoned for an ambulance and notified police. Shortly thereafter plaintiff was taken to a hospital where he was given proper medical treatment.

The jury were fully justified in finding from the foregoing evidence that defendant was guilty of negligence in pushing its cars from its private right of way into a public street at night without maintaining a reasonable lookout or a proper light on its lead car.

The next question presented is whether plaintiff was guilty of contributory negligence as a matter of law. A determination of this issue requires a more careful review of plaintiff's own testimony.

Plaintiff testified that he was sober (although there is testimony tending to show that he had been drinking) and in full possession of his physical and mental faculties. His eyesight and hearing were normal.. After he got out of the Zimmerman automobile he walked "right close to the railroad tracks in Dock street" (a distance of 185 feet) to the switch where the Talbott alley track merged with those in lower Dock street, and stopped between the rails of the Talbott alley track, "in the darkest place he could find." Before he started to urinate, and while urinating, he looked east and west along lower Dock street, and saw no trains or other traffic. His exact language was: "I was facing north so I was bound to be facing the railroad track coming out of there, or pretty close to it." He could see "75 or 80 probably, maybe 90 feet" up the track on which the train was approaching, and yet he neither saw nor heard the train until it "just popped right up on me."

█ Defendant and plaintiff had equal rights to the use of lower Dock street, subject however to the superior right of defendant to operate its trains upon its track laid in the street. Plaintiff, while using that portion of the street between the rails, was charged with the duty of exercising reasonable care for his own safety. The railroad track was a proclamation of danger and notice to him that defendant could use only that portion of lower Dock street on which its rails were laid for movement of its trains. Plaintiff was not so restricted in the use of the street, and when he elected to use that part of the street between the rails, the exercise of ordinary care for his own safety required him to look and listen for approaching trains in every direction that the tracks extended.

█ "The mere fact of looking and listening is not always a performance of the duty incumbent upon the traveller, for he must also exercise care to make the act of looking and listening reasonably effective." *Washington-Southern R. Co.* v. *Lacey*, 94 Va. 460, 475, 26 S.E. 834.

According to plaintiff's own testimony, he deliberately placed himself at a point a foot or two north of the railroad track which extends east and west along Dock street and between the rails of the track which extended into Talbott's alley. This required plaintiff to exercise that degree of care commensurate with the danger in which he had placed himself.

Plaintiff estimated that the train was traveling at a speed of 10 miles an hour. He neither saw nor heard it until it was close enough for him to "grab it." The five men in charge of the train, who were in position to estimate more accurately the speed of the train, testified that it was moving between 3 and 4 miles an hour, and its speed was decreasing as it passed the point where plaintiff was struck. If plaintiff had looked with reasonable care he could have seen the train when it was between 75 to 90 feet from him. Even if it were moving at 10 miles an hour, he should have seen or heard it in time to have taken the one or two steps necessary to avoid injury to himself.

Plaintiff contends that he was standing in the shadow of the Seaboard Air Line trestle, looking into "pitch black darkness." This contention is inconsistent with his testimony. He admits that there was a light to the east of him at 17th and lower Dock streets and one to the west of him at 16th and lower Dock streets. He could see from one end of the street to the other, and admits that while facing north he could see 75 to 90 feet up the track upon which the train was approaching.

Plaintiff's argument is that while he knew that the track on which he was standing led up toward the alley, he thought that it was a dead-end track and (inferentially) did not expect a train to approach from that direction. The uncontradicted testimony as to the physical facts shows that there was nothing to obstruct his view or prevent him from seeing the train from the time it left Talbott's alley, a distance of more than 250 feet.

There appears to have been no other noise of moving trains or vehicles which would have tended to confuse plaintiff or distract his attention from the noise made by this particular train as it was shoving cars through the S curve.

█ It is well settled in this jurisdiction that a railroad track is a proclamation of danger, which imposes upon a person desiring to cross or stand on it a duty to look and listen with reasonable care. This duty cannot be discharged by claiming that no train was expected, or that the view was obstructed, or hearing impaired.

█ The following extract from the opinion in *Norfolk, etc., Ry. Co.* v. *Epling*, 189 Va. 551, 557, 53 S. E. (2d) 817, stating the duty of the operator of a motor vehicle, is applicable to a pedestrian standing on a railroad track:

"A railroad track is a proclamation of danger and a traveler on a highway approaching a grade crossing is required to look and listen at a time and place when both looking and listening will be effective. He, for his own protection, must intelligently use both eyes and ears. He must remember that trains run upon fixed tracks and that their course cannot be deviated either to the right or to the left, while no such steel-bound limitation controls the movement of motor vehicles. If a traveler on a highway drives blindly upon a grade crossing, whether his view is obstructed or unobstructed, and takes no precaution for his own safety and is injured, his negligence precludes recovery * * * ,,

The judgment of the trial court is reversed, the verdict of the jury set aside, and final judgment entered for defendant.

*Reversed and final judgment.*